UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

```
* * * * * * * * * * * * * *
UNITED STATES OF AMERICA,    * CRIMINAL NO. 7:24-cr-00281-HMH-1
                             * JUNE 18, 2024  9:35 A.M.
                             * MOTION TO SUPPRESS HEARING
                Plaintiff,   *
v                            *
                             *
MELVIN MAXWELL,              * Before:
                             * HONORABLE HENRY M. HERLONG, JR.
                             * UNITED STATES DISTRICT JUDGE
                Defendant.   * DISTRICT OF SOUTH CAROLINA
* * * * * * * * * * * * * *
```

APPEARANCES:


For the Plaintiff:      MAXWELL BARNES CAUTHEN, III, AUSA
                                United States Attorneys Office
                                55 Beattie Place, Suite 700
                                Greenville, SC  29601


For the Defendant:      BENJAMIN STEPP, ESQUIRE
                                Federal Public Defenders Office
                                75 Beattie Place, Suite 950
                                Greenville, SC  29601


Michele E. Becker, RMR, CRR, RPR
U.S. District Court Reporter
250 East North Street, Room 3404
Greenville, SC  29601


Proceedings recorded by mechanical stenography, transcript produced by computer-aided software.

I N D E X

WITNESS:  BRANDON DORSETT.

DIRECT EXAMINATION BY THE PLAINTIFF ............. Page 04

CROSS EXAMINATION BY THE DEFENSE ................ Page 13


EXHIBITS:

Government's Exh. 1  ........................... Page 08

3

1

2                    **P R O C E E D I N G S**

3     (Court is called to order on Tuesday, the 18th of June 2024,

4     at 9:35 a.m.)

5              **MR. CAUTHEN:**  May it please the Court?  Good

6     morning, Your Honor.  We're here on Case No. 7:24-281, the

7     United States versus Melvin Antonio Eugene Maxwell.  He is

8     present and he's represented by Mr. Stepp.  The defense has

9     filed a motion to suppress.  The government has responded.  We

10    are ready to proceed.

11             **THE COURT:**  Is that correct, Mr. Stepp?  You wish to

12    proceed with the suppression hearing?

13             **MR. STEPP:**  Yes, Your Honor.  We're here on my

14    filing at ECF Number 37, a motion to suppress.  The government

15    responded at ECF 38, and we're ready to go forward.

16             **THE COURT:**  All right.

17             **MR. CAUTHEN:**  May it please the Court?  The

18    government at this time would call Brandon Dorsett to the

19    stand.

20             **THE CLERK:**  Raise your right hand, please.  Place

21    your left hand on the Bible and state your name for the

22    record.

23             **THE WITNESS:**  Brandon Dorsett.

24             WITNESS - BRANDON DORSETT - DULY SWORN

25             **THE WITNESS:**  I do.

Direct Exam by the Plaintiff - Witness Brandon Dorsett

4

1    **THE CLERK:**  Thank you.  You can be seated in the

2    witness stand.

3    **MR. CAUTHEN:**  Have a seat and lean forward to the

4    microphone if you will, please, sir.

5    **DIRECT EXAMINATION BY THE PLAINTIFF**

6    **BY MR. CAUTHEN**

7    **Q**    You are Brandon Dorsett?

8    **A**    Yes, sir.

9    **Q**    Back on November 27th of 2023, where were you working

10   at that time?

11   **A**    I was working at Cherokee County Sheriff's Office.

12   **Q**    What was your position?

13   **A**    Lieutenant in the narcotics division.

14   **Q**    And in working for the Cherokee County Sheriff's

15   Office, what were you doing in Spartanburg County on

16   November 27th?

17   **A**    We were participating in Operation Rolling Thunder.

18   We basically go out and enforce traffic laws and try to

19   make the roads safer.

20   **Q**    How long does that program or that activity last?

21   **A**    It runs from Monday usually till Thursday.

22   **Q**    And did you encounter the defendant on November the

23   27th, that day while you were working?

24   **A**    Yes, sir.  I did.

25   **Q**    Were you working alone or was there another officer

1    in your car?

2    **A**    I was alone in my car.

3    **Q**    Were there other officers in the area nearby?

4    **A**    Yes, sir.

5    **Q**    And were you in uniform?

6    **A**    Yes, sir.

7    **Q**    Was your patrol vehicle marked or was it undercover?

8    Tell us about that.

9    **A**    My patrol vehicle at the time was an undercover

10   Toyota Tundra.  It does have 360 lights, siren.

11   **Q**    And how long did you work in law enforcement?

12   **A**    Since 2008.

13   **Q**    And when did you leave law enforcement?

14   **A**    April of this year.

15   **Q**    Of this year?

16   **A**    Yes, sir.

17   **Q**    Okay.  And that was the Cherokee County Sheriff's

18   Office?

19   **A**    Yes, sir.

20   **Q**    And why did you leave the Cherokee County Sheriff's

21   Office?

22   **A**    I got fired from the sheriff's office.

23   **Q**    For what?

24   **A**    It was a difference of opinion, me and the sheriff.

25   He fired me for insubordination.

Direct Exam by the Plaintiff - Witness Brandon Dorsett

6

1  **Q**   And his opinion mattered most?

2  **A**   He's the sheriff.  He could do that, yes, sir.

3  **Q**   Were you working on the 27th?  Was that a day shift

4  or night shift that you were on patrol?

5  **A**   That was day shift.

6  **Q**   And tell us about your encounter with the defendant.

7  How did that come to be, please, sir?

8  **A**   I was patrolling northbound on 85, and I noticed the

9  vehicles were slowing down in the left lane having to go

10  around another vehicle.  I continued to follow for about a

11  half a mile, and the vehicle continued to stay in that

12  lane.  So I moved over, activated my lights to get behind

13  the vehicle to pull him over.  Just advised him slower

14  traffic needs to keep to the right so the vehicles can

15  pass through there.

16  **Q**   So the vehicle you were behind, which was going slow,

17  was in which lane?

18  **A**   Number 1 lane.  The farthest lane to the left.

19  **Q**   Is that what I would call the passing lane?

20  **A**   Passing lane.  Yes, sir.

21  **Q**   And so did the vehicle -- did you blue light the

22  vehicle?

23  **A**   I did, sir.

24  **Q**   And did the vehicle immediately pull over?

25  **A**   Pretty much he moved over to the next lane with no

1    signal, and then he got a signal on and got onto the side

2    of the road.

3    **Q**    And did you approach, get out of your truck and

4    approach the vehicle and the driver?

5    **A**    Yes, sir.  I did.

6    **Q**    And tell us about that.  How did that go?

7    **A**    I approached the vehicle and told them, spoke to them

8    briefly about the stopping and slowing down in the lane,

9    that you need to move over.  It's a passing lane only.

10   And I could smell an overwhelming odor of marijuana.  I

11   could smell it before I got to the vehicle.

12   **Q**    Did you approach on the driver side or the passenger

13   side?

14   **A**    On the passenger side.

15   **Q**    Was the window down?

16   **A**    From my memory he just rolled it down a small amount.

17   **Q**    Okay.  And was the driver aware he needed to drive

18   not in the left lane but in the right slower lane?

19   **A**    I believe he told me he was not familiar with that

20   law.

21   **Q**    Did he tell you whether he was from South Carolina?

22   **A**    Can I look at my report because I don't remember?

23   **Q**    Yes, sir.

24   **A**    I don't remember if he told me he was or wasn't from

25   South Carolina.

Direct Exam by the Plaintiff - Witness Brandon Dorsett

8

1  **Q**    Were you wearing a body camera that day?

2  **A**    Yes, sir.  I was.

3  **Q**    And did you activate it when the defendant began to

4  pull over?

5  **A**    Yes, sir.  I did.

6  **Q**    And have you reviewed that body camera footage?

7  **A**    Yes, sir.  I have.

8  **Q**    Is it accurate?

9  **A**    Yes, sir.

10  **Q**    I'm going to show you what's marked as Government's

11  Exhibit Number 1.  Does that bear your initials?

12  **A**    Yes, sir.  It does.

13  **Q**    And is this the disk containing your body worn

14  camera?

15  **A**    Yes, sir.  It is.

16          **MR. CAUTHEN:**  At this time I would move it into

17  evidence.  Mr. Stepp has been provided a copy in discovery.

18          **MR. STEPP:**  No objection.

19          **THE COURT:**  In evidence without objection.

20          (Whereupon, Plf's Exh. No. 1 is admitted.)

21          **MR. CAUTHEN:**  Would move to play the first segment

22  from the beginning of the stop, six minutes and ten seconds

23  approximately, Your Honor.

24          (Whereupon, the video is playing.)

25  **BY MR. CAUTHEN**

1  **Q**    Mr. Dorsett, at this point have you called for

2  backup?

3  **A**    Yes, sir.  I did.

4  **Q**    And what was the reason for calling for the backup

5  deputies or officers.

6  **A**    The odor of marijuana for the vehicle search.

7  **Q**    Thank you.  Please continue.

8       (Whereupon, the video is playing.)

9  **BY MR. CAUTHEN**

10  **Q**    Are you filling out a ticket?

11  **A**    Right now I'm filling out a warning for the

12  violation.

13  **Q**    Okay.  Thank you.

14       (Whereupon, the video is playing.)

15  **BY MR. CAUTHEN**

16  **Q**    Mr. Dorsett, when you approached the vehicle, what

17  was the conversation you had with the driver at that time?

18  **A**    I just asked, basically asked him to step back and

19  talk with me because of the odor of marijuana out of the

20  car, and talk with me.

21  **Q**    And what was his response?  Did he say anything?

22  **A**    I believe he said he didn't have anything in the car.

23  **Q**    And was the door unlocked?

24  **A**    It was locked.  I touched the unlock button so my

25  partner had to unlock the door, but he locked it back

1    immediately.

2    **Q**    And he drove off?

3    **A**    Yes, sir.

4    **Q**    After he drove off did he get very far?

5    **A**    He took the next exit off at the 63, I believe, and

6    then crashed his vehicle right there as soon as he got off

7    of that.  Within a couple of blocks he crashed the vehicle

8    and exited on foot.

9    **Q**    Did you catch him?

10    **A**    Yes, sir.

11    **Q**    Okay.  And were you the one that ultimately searched

12    his vehicle?

13    **A**    Yes, sir.

14    **Q**    And did you find the items at issue in the

15    indictment?

16    **A**    Yes, sir.  I did.

17    **Q**    When you went to pull him over, you mentioned that he

18    was riding in the left lane and then did not use a turning

19    signal when he changed lanes; is that correct?

20    **A**    From the number 1 to the number 2 lane, and then when

21    he got on number 2, right before pulling over he turned

22    the signal on and you can see he stayed on in the video

23    there.

24    **Q**    Look at what is marked as Government's Exhibit

25    Number 2.

Direct Exam by the Plaintiff - Witness Brandon Dorsett

11

1      **MR. CAUTHEN:**  Your Honor, a copy has been provided

2  to defense counsel.

3  **BY MR. CAUTHEN**

4  **Q**    Do you recognize that?

5  **A**    Yes, sir.

6  **Q**    And what is that?

7  **A**    It's just -- they put a new state law sign up where

8  you advise that traffic needs to move to the right.

9  **Q**    And did you see the mile marker listed there?

10  **A**    Yes, sir.  It's mile 60.

11  **Q**    And your stop of the defendant occurred approximately

12  where?

13  **A**    Just prior to exit 63.

14  **Q**    Okay.  And in your report, what is the reason that

15  you listed for pulling the car over?

16  **A**    Failure to use a turn signal.

17  **Q**    And I believe you told the driver at the stop that it

18  was for driving in the left lane; is that correct?

19  **A**    Yes, sir.

20  **Q**    Why did you tell him one thing and write the other?

21  **A**    Well, I told him that.  And when I got back to

22  writing my report, initially that's the one I remembered

23  right off the top of my head.  I believe ATF was there.

24  That's when I hurry up and get a report because they need

25  to see the judge.

Direct Exam by the Plaintiff - Witness Brandon Dorsett

12

1   **Q**   And did you issue any tickets as a result of those

2   violations?

3   **A**   I wrote the one ticket, yes, sir.

4   **Q**   For what?

5   **A**   For the left lane.

6   **Q**   Warning ticket for the left lane?

7   **A**   Yes, sir.  For not moving over.  Yes, sir.

8   **Q**   And with respect to that state law, was there any

9   inclement weather or items in the roadway that prohibited

10  him from driving in the proper lane?

11  **A**   No, sir.  Not on this date.  There was not.

12  **Q**   Were there other vehicles behind his car that were

13  having to pass him in that lane?

14  **A**   Yes, sir.  It was.

15  **Q**   Were there any obstructions or other hazards that

16  prevented him from driving in the right lane?

17  **A**   No, sir.

18  **Q**   Any law enforcement or emergency vehicles that

19  required him to drive in the left lane?

20  **A**   No, sir.

21  **Q**   And the backup officer, who was that?

22  **A**   Sergeant Cody Painter.

23  **Q**   Did he work with your department as well?

24  **A**   Yes, sir.

25  **Q**   Was he involved in the pursuit after the defendant

Cross Exam by the Defense - Witness Brandon Dorsett

13

1    left the scene?

2    **A**    Yes, sir.  He was.

3    **Q**    And subsequently did you find any marijuana upon your

4    search?

5    **A**    Yes, sir.  We did.

6          **MR. CAUTHEN:**  Thank you, sir.  If you would,

7    Mr. Dorsett, please answer any questions which either

8    Mr. Stepp or the Court may have for you.

9          **THE WITNESS:**  Yes, sir.

10          **MR. CAUTHEN:**  Thank you, sir.

11          **CROSS EXAMINATION BY THE DEFENSE**

12   **BY MR. STEPP**

13   **Q**    May it please the Court?

14        So Mr. Dorsett, on the 27th of November of '23, you

15   were working this Rolling Thunder -- excuse me, Rolling

16   Thunder Operation in Spartanburg; is that correct?

17   **A**    Yes, sir.

18   **Q**    Okay.  Let me get over here.  And have you done

19   Rolling Thunder work before?

20   **A**    Yes, sir.

21   **Q**    And this is a -- something -- a law enforcement

22   program that's sponsored by the Sheriff of Spartanburg

23   County; is that right?

24   **A**    Yes, sir.  It is.

25   **Q**    And this has been done for several years now?

Cross Exam by the Defense - Witness Brandon Dorsett

14

1  **A**    Yes, sir.

2  **Q**    Okay.  And how many years have you participated in

3  Rolling Thunder?

4  **A**    Believe the first one, I believe, was 2014.  I could

5  be wrong.  But 2012 or 2014 is around when I started.

6  **Q**    So about eight years or so?

7  **A**    Yes, sir.

8  **Q**    Okay.  And so the purpose of this is to have -- well,

9  let me just ask it.  The Rolling Thunder Operation really

10  only encompasses the section of I-85 in Spartanburg

11  County; is that right?

12  **A**    It's a county-wide operation.  We do any area in

13  Spartanburg County.  This concentrates on the interstates

14  of 26 and 85 for traffic violations.

15  **Q**    And so this is an aggressive enforcement of the

16  traffic rules; is that a fair way to put it?

17  **A**    Yes, sir.

18  **Q**    And so on this date in connection with this case you

19  were in a -- you said an undercover vehicle.  Is that a

20  vehicle issued by Cherokee County or Spartanburg County?

21  **A**    By Cherokee County.

22  **Q**    And is that the vehicle that you usually traveled

23  around in in Cherokee County?

24  **A**    Yes, sir.

25  **Q**    And the picture of that vehicle can be seen in the

Cross Exam by the Defense - Witness Brandon Dorsett

15

1    body cam on the side of the road; is that right?

2    **A**    Yes, sir.

3    **Q**    All right.  And I didn't remember, but were you in

4    uniform on that day?

5    **A**    Yes, sir.

6    **Q**    All right.  So when you first -- we know where this

7    thing ended up on the side of the road there near the exit

8    to Duncan and Moore, right?

9    **A**    Yes, sir.

10   **Q**    Okay.  So before you pulled the car over, where did

11   you first observe the car?

12   **A**    I probably followed maybe an area of a half a mile,

13   approximately.

14   **Q**    Okay.  And when the video comes on on the body

15   camera, you activated that video to start recording; is

16   that correct?

17   **A**    Yes, sir.

18   **Q**    Okay.  And there's no in-car video recording device,

19   right?  It's all body camera that you wear on your chest;

20   is that correct?

21   **A**    Yes, sir.  That's correct.

22   **Q**    So, there's no video of how that car was being driven

23   or anything on the highway, is that right?

24   **A**    Yes, sir.  That's correct.

25   **Q**    So we just have your word about what you say you saw

Cross Exam by the Defense - Witness Brandon Dorsett

16

1   that went on, correct?

2   **A**    Yes, sir.  That's correct.

3   **Q**    Okay.  So there's no -- the other officer who was

4   seen on the video at the end of this thing, he was not a

5   part of the traffic stop at all, was he?

6   **A**    No, sir.  He was not.

7   **Q**    Okay.  So he wouldn't be a witness to know what the

8   driving of this vehicle was like, correct?

9   **A**    Yes, sir.  That's correct.

10  **Q**    And in fact, this vehicle was a black Nissan; is that

11  correct?

12  **A**    I believe it was correct.  Yes, sir.

13  **Q**    Well, you wrote it up in your report.  Do you

14  remember that?

15  **A**    Yes, sir.

16  **Q**    Okay.  And it had a Connecticut license tag, right?

17  **A**    Yes, sir.

18  **Q**    Okay.  So, at what point in this process before the

19  car stop was made, at what point did you get behind that

20  Nissan vehicle?

21  **A**    Fifty yards before we pulled over.

22  **Q**    So, where were you parked in your vehicle before you

23  pulled out to pull this car over?  Were you parked on the

24  edge of the interstate?

25  **A**    At this time he was just driving northbound at this

Cross Exam by the Defense - Witness Brandon Dorsett

17

1    time.

2    **Q**    Okay.  So you were not stationary on the side of the

3    road?

4    **A**    No, sir.

5    **Q**    You were driving up the highway?

6    **A**    Yes, sir.

7    **Q**    Traveling north on 85?

8    **A**    Yes, sir.

9    **Q**    Okay.  And so you say you saw this Nissan in the far

10   left lane, correct?

11   **A**    Yes, sir.

12   **Q**    And in your testimony to the U.S. attorney was

13   because you saw this vehicle in the -- driving in the left

14   lane, that you followed it for some period of time, is

15   that right, about half a mile?

16   **A**    Yes, sir.

17   **Q**    Okay.  So when the video begins and we see what we

18   just saw, does that indicate that your blue light had been

19   activated in your car?

20   **A**    No, sir.  Mine does not activate with the blue lights

21   in my vehicle.

22   **Q**    So at the time that the video was being shown, was

23   the blue light activated or not?

24   **A**    I mashed my camera button and it goes back previous

25   20 seconds.

1   Q    Right.

2   A    It runs back 20 seconds.  So right before I activate

3   my blue lights I mashed the button.

4   Q    So when we hear audio on the body -- on the video we

5   just looked at, that indicates that that's the point where

6   you actually activated your camera; is that right?

7   A    I couldn't speak to that.  It's a possibility.  I'm

8   not sure.  I'm not an expert on those when it comes on, is

9   what I'm saying.

10  Q    Well, I thought you just told me that the thing

11  backed up and picked up some previous 30 seconds or so.

12  A    Yeah.  It would -- you would be correct.  When the

13  beep sounds, when the audio starts, probably about the

14  time where I mash the button you can see my hands.

15  Q    So at that time where were you in relation to this

16  black Nissan?

17  A    Behind the vehicle at that time.

18  Q    Were you directly behind the vehicle?

19  A    Yes, sir.

20  Q    Okay.  And so at the time that you saw it -- so there

21  was nobody between you and this vehicle, correct?

22  A    Not at this time.

23  Q    And you -- at that point you say you put the blue

24  light on him to notify him that he was breaking the law;

25  is that right?

Cross Exam by the Defense - Witness Brandon Dorsett

19

**A**     Yes, sir.

**Q**     Okay.  And at that time you were the only car behind him; is that right?

**A**     Yes, sir.

**Q**     Okay.  And could you see how many cars were in front of him?

**A**     I couldn't say.  It's interstate, you know.  It's three lanes.  I don't know how many there was, sir.

**Q**     So you don't know whether there was congestion in that lane or congestion on the highway or anything like that; is that correct?

**A**     Well, we were running in the neighborhood of 60 miles an hour, 65.  I don't believe any congestion.

**Q**     So it didn't appear that he was blocking traffic or anything like that?

**A**     Like I said, in the beginning the cars are having to go around him in the number 1 lane.  That's what I observed, cars coming up in the fast lane.  They had to go around him because he was just staying steady.  That's why I just followed his car.  I continued to following the cars, and cars continued to go around him to pass.

**Q**     And then you came up behind him, right?

**A**     Yes, sir.

**Q**     And so it's your testimony that that's the reason why you put the blue light on him, correct?

Cross Exam by the Defense - Witness Brandon Dorsett

20

**A** Yes, sir. Initially for that reason. And then when he -- when I blue lit him, he went from the 1 to the 2 lane, which would be the middle lane with no signal. And then he put his signal on as he gets on over off the road.

**Q** But yet we know what you told him when you walked up to his car.

**A** Yes, sir.

**Q** You told him I stopped you because you didn't signal changing lanes.

**A** I told him I stopped him because he was holding up the traffic in the number 1 lane.

**Q** I'm sorry, that's what you wrote in your report that you stopped him for not signaling changing lanes, right?

**A** Yes, sir.

**Q** Okay. And it's your testimony that you really blue lighted him because he was obstructing traffic in the far left lane?

**A** Yes, sir. That was the initial thing. He committed another violation before we stopped.

**Q** Well, okay. But you had already blue lighted him, which meant he was supposed to stop?

**A** Yes, sir.

**Q** Okay. And he did stop for you.

**A** Yes, sir. He did.

**Q** And your reason to him on the side of the road was

Cross Exam by the Defense - Witness Brandon Dorsett

21

1    that he was driving in the far left lane riding and riding

2    and riding and riding?

3    **A**    Yes, sir.

4    **Q**    When did you prepare your written report?

5    **A**    As soon as I got back to probably five minutes after

6    I got back, I believe members from ATF had came there,

7    asked me to hurry up and write the report.  They needed to

8    see the judge.

9    **Q**    Okay.  So have you looked back over your report that

10    you wrote up?

11    **A**    Yes, sir.

12    **Q**    Okay.  And you would agree that nowhere in that

13    report do you put in there that he didn't signal; is that

14    correct?  Well, wait a minute.  I may be wrong.  Make sure

15    I get this right here.  Said you observed him changing

16    lanes from the number 1 lane to the number 2 lane without

17    using a signal.  But that's not what you told him on the

18    side of the road, right?

19    **A**    That's correct.  He committed two violations.  I told

20    him the original one I stopped him for.

21    **Q**    But you didn't write up that he committed two

22    violations in your official report?

23    **A**    That's correct, sir.

24    **Q**    So you could see on this particular day the weather

25    was sunny.  You can see it in this video, right?

Cross Exam by the Defense - Witness Brandon Dorsett

22

1    **A**    Yes.

2    **Q**    Clear, sunny weather, right?

3    **A**    Yes, sir.

4    **Q**    And you could clearly see that this vehicle was not

5    from South Carolina, right?

6    **A**    Yes, sir.

7    **Q**    And did you call in the tag before you pulled it

8    over?

9    **A**    Yes, sir.

10    **Q**    Okay.  So you knew that it was a rental car too,

11    didn't you?

12    **A**    Yes, sir.

13    **Q**    Okay.  And in your experience as a law enforcement

14    officer, you know that people run drugs up and down I-85,

15    right?

16    **A**    I experienced them doing that, yes, sir.

17    **Q**    And you know from your experience that you -- that

18    rental cars can often be used to run drugs up and down

19    I-85, right?

20    **A**    Yes, sir.  I've seen that.

21    **Q**    And you could clearly see on a sunny and clear day

22    into that car and see that there was one person driving

23    that car, right?

24    **A**    Yes, sir.  I could see.  Appeared to be one.

25    **Q**    And it looked like a black guy, right?

1    **A**    It couldn't be -- I couldn't tell you.  At 65 miles

2    an hour, it's kind of difficult.

3    **Q**    So you testified earlier to the U.S. attorney that in

4    this video at the 10:22 mark, you're sitting in your car

5    doing among other things, you said writing a warning

6    ticket for the violation for driving in the left lane.

7    You remember testifying to that?

8    **A**    Yes, sir.

9    **Q**    Okay.  Did you bring a copy of that warning ticket?

10   **A**    No, sir.  I did not.

11   **Q**    Were you asked to bring a copy of the warning ticket?

12   **A**    No, sir.  I was not.

13   **Q**    Does one exist?

14   **A**    I turned them all in to the sheriff's office.  We

15   turn them in when we're done with them.

16   **Q**    Which sheriff's office?

17   **A**    Cherokee County Sheriff's Office.

18   **Q**    And that ticket would say that you wrote him up for

19   driving in the left lane; is that right?

20   **A**    I believe the warning, yes, sir.

21   **Q**    So, you on this video thing here, you can see these

22   exit signs on the interstate, correct?

23   **A**    I apologize.  What sign, sir?

24   **Q**    The exit signs on the interstate, you can see where

25   you pulled him over.  There's a sign up ahead that has an

Cross Exam by the Defense - Witness Brandon Dorsett

24

1  exit arrow pointing to this exit 63 or whatever it is to

2  go to Moore; is that right?

3  **A**    Yes, sir.

4  **Q**    And that's the exit that he flew up on and got off

5  the highway there; is that right?

6  **A**    Yes, sir.  That's correct.

7  **Q**    So you understand that the situation is, why did you

8  pull this man over?  Why did you get him off of the

9  highway traveling up the road and have to submit to you on

10  the side of the road?  You understand that, right?

11  **A**    Yes, sir.

12  **Q**    Okay.  And you understand that your testimony is the

13  only testimony there is about this traffic stop, the basis

14  for it?  You understand that?

15  **A**    Yes, sir.  I understand.

16  **Q**    Okay.  And yet in preparation for this hearing you

17  didn't go and try to get this warning ticket or anything

18  like that to bring over here?

19  **A**    No, sir.  I did not.

20  **Q**    Are you -- what kind of work are you doing now?

21  **A**    Industrial electrical work.

22  **Q**    And when were you discharged by the Sheriff of

23  Cherokee County?

24  **A**    Sometime in April, I believe.

25  **Q**    And this was an issue between you and the Sheriff

Examination by the Court - Witness Brandon Dorsett

25

1    about some business in the sheriff's department, right?

2    **A**    Yes, sir.

3    **Q**    This wasn't some side problem that you had with an

4    argument with somebody else, correct?

5    **A**    No, sir.

6         **MR. STEPP:**  Could I have just a minute, please,

7    Judge?

8         (Pause.)

9         **MR. STEPP:**  Thank you, sir.  That's all the

10   questions I have.

11        **THE COURT:**  I want to clarify some of your

12   testimony.  You were patrolling on I-85 driving north; is that

13   correct?

14        **THE WITNESS:**  Yes, sir.

15        **THE COURT:**  And let's -- did you say earlier that

16   there were three lanes, northbound lanes?

17        **THE WITNESS:**  Yes, sir.

18        **THE COURT:**  All right.  Which lane were you in?

19        **THE WITNESS:**  It would be the middle lane, sir.

20        **THE COURT:**  So you were in the middle lane and so

21   there was a lane to your left and also a lane to your right?

22        **THE WITNESS:**  Yes, sir.

23        **THE COURT:**  And so did you come up behind the

24   defendant's vehicle?

25        **THE WITNESS:**  Yes, sir.

Examination by the Court - Witness Brandon Dorsett

26

1          THE COURT:  And were there automobiles there,

2    vehicles in the right lane at this time?

3          THE WITNESS:  There were vehicles in all three

4    lanes, yes, sir.

5          THE COURT:  And as far as the progress of the

6    vehicles in the middle lane, the lane that you were in, how

7    did they relate to the progress of the vehicles in the far

8    right lane?  You understand what I'm asking?

9          THE WITNESS:  When I say progress --

10          THE COURT:  Yes, sir.

11          THE WITNESS:  -- I noticed that there's a lot of

12    vehicles behind the defendant's vehicle.  They're having to go

13    up, pass into the number 2 lane, and go around him to get back

14    over.  Each one had to go up --

15          THE COURT:  I thought he was in the number 2 lane?

16          THE WITNESS:  He was in the far left lane, the fast

17    lane.

18          THE COURT:  He was in the third lane over?

19          THE WITNESS:  Yes, sir.  The fast lane.  That's

20    where you -- passing only lane.  That's where he was at.  The

21    vehicles would be coming up just to go around him to go.

22          THE COURT:  So to get around him they would go to

23    the right --

24          THE WITNESS:  Yes, sir.

25          THE COURT:  -- into the number 2 lane?

1          **THE WITNESS:**  Yes, sir.

2          **THE COURT:**  All right.  Anything further from the

3     government?

4          **MR. CAUTHEN:**  No, sir, Your Honor.

5          **THE COURT:**  From the defendant?

6          **MR. STEPP:**  No, sir.

7          **THE COURT:**  You may step down.  Thank you, sir.

8          Anything further from the government?

9          **THE COURT:**  I'll hear from you if you care to argue

10    the case.  Mr. Stepp.

11         **MR. STEPP:**  Thank you, Judge.  It's our position

12    that he clearly stopped him, blue lighted him, got him off the

13    highway on the side of the road, and whatever happened after

14    that happened after that.  Focus of this motion is the car

15    stop itself, the seizure of my client.  And it's a -- it's

16    either a credibility question or do you trust what the officer

17    has told you about what really happened, because we don't have

18    any video or audio about what happened on the driving part of

19    it.  The only audio we have is him telling Mr. Maxwell that I

20    pulled you over because you were in the passing lane and you

21    were just driving and driving and driving, and that's what he

22    told him.  Now, he didn't have to tell him anything about why

23    he pulled him over, but that's what he told him he did.

24         Yet, in his official report that the federal agency

25    had asked about, he puts in there that he didn't signal on a

lane change.  And he says here, well, the lane change -- he had already decided to pull him over.  So this lane change thing was not the reason he pulled him over because he had already blue lighted him.  And according to him he was complying and moving over in regard to the blue light.  So we have that inconsistency.  We don't know what happened other than what he said.

Then you have the situation where the officer has been discharged from working for the sheriff's office for insubordination which is, you know, not following the rules.  Somebody who just cannot or is unwilling to submit to authority and gets to the point where it's just, you know, you're done, you're fired.

And so I would just ask the Court to take that into consideration.  I think his testimony that he gave is not supported by the evidence, and that it's more likely than not under a Rolling Thunder situation that they're out there trying to pull people off the highway, get car searches and things like that.  That it's just as likely to believe that he saw a car driven by a black man on a sunny day in Spartanburg with Connecticut tags on one guy in a car all by himself, and he decided he wanted to pull him over, and he violated his Fourth Amendment rights.

THE COURT:  I assume when you -- because I asked you whether you had any argument, I did not ask you, but obviously

you knew that the defendant had the right to put up any --
you're not putting up any evidence?

       **MR. STEPP:**  Correct.  Yes, sir.

       **THE COURT:**  Thank you, Mr. Stepp.

       As you said, this is a credibility issue.  And the
only evidence is, first, that the law in South Carolina where
this occurred does require for slower traffic to drive in the
right lane.  And he was in the far left lane.  And the only
evidence is that he was committing a traffic violation by
going slower than the traveling vehicles in the right lane or
either of the right lanes, and he therefore had a -- it was
proper for him to stop the defendant's vehicle because of a
traffic violation, that is, driving in the passing lane slower
than the traffic and the right lane to his right.  And the
officer, the only evidence is that the testimony is that after
turning on his blue light to effectuate the stop, that the
defendant's vehicle did move to the right -- to the right and
exit to the shoulder of the road and failed to signal in doing
so, which is a -- which the only evidence is that is also a
traffic violation.

       So what the officer was confronted with was a
situation of two traffic violations.  One is the statute that
prohibits driving slower in the passing lane.  And also the
statute that requires signaling, making a lane change.
Therefore the officer's conduct in making the stop was proper

and there was -- at that point the question before the Court is whether the stop was appropriate, because what followed after the stop is the basis for the charge for which the defendant has been indicted.  The motion to suppress is therefore denied.

        I will take a short break.

(Whereupon, a recess was taken at 10:16 a.m.)

(Proceedings were held but not transcribed at this time.)

(Court adjourned at 12:46 p.m.)


CERTIFICATE

I,  Michele E. Becker, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Michele E. Becker          Date:  01/25/2025